LLC, 2560084. Looks like Mr. Buchanan is ready. You may proceed. Pat Buchanan on behalf of the appellant, Rx Solutions, Your Honor. I want to start with I agree with the statement Mr. Horvath made in his brief where he said a party should have to live with the consequences of its decision. In this case, the decision at issue that leads to the consequences is the decision by Caremark and CVS to deny Rx Solutions entry into Caremark's pharmacy benefit network. It is also the decision to state a false narrative that Rx Solutions was denied entry into the PBM because of a gentleman named Ted Cain. In light of the conduct of CVS, we know this is a false statement and I would also say the allegations against Mr. Cain, those are factual allegations that would come at a later time through discovery and, you know, we're here on the basis of the allegations. The existing record doesn't tell us if the elder Cain had any relationship to Rx in the 2021-23 period. But it does in the complaint. The complaint says that he is not a member, that it is. He was not in leadership then? He was not in control as defined under the operative terms of the statutes and the applicable statutes. It is controlled, well, it is owned by the two children through trust, but it is controlled or operated by a gentleman named Lee Bond and Lee Bond is the former CEO of Singing River Health Systems. Through the conduct though, Your Honor, of the employees, they have now been able to avoid the consequences of their denial, avoid discovery into their conduct for over two and a half years now and I would suggest and submit to you we are here on this appeal from my perspective because justice delayed is justice denied. And the three issues I'd like to cover with you this morning about Appellee's conduct are this. First, under the Twombie and the Gulf Coast Hotel Association cases, this case should not have been dismissed on a motion to dismiss. Second, under the American Needle case, Caremark and CVS can conspire with each other. They are separate centers of decision making entities and can conspire under American Needle. And finally, under the Harvey case, the district court has jurisdiction over this, over the state law claims because there is diversity. I mean, there just, there is diversity. It's admitted. So let's start with the background. Is there any dispute about diversity? I mean, it was pled in an original complaint. It wasn't pled in a later complaint. But haven't the defendants basically admitted diversity? Exactly, Judge. Do we need to do any supplemental briefing or filings like we, I can't remember the statute number, but you know, it allows us to do that to verify it or is it really apparent? I think it's really apparent because it's admitted. The defendants have admitted it. It was pled in both complaints and when the district court dismissed the first complaint, the district court had one singular issue with the complaint and that was it said we didn't state a geographic market. There were no other issues, diversity or any of the other issues that the our first amended complaint. So in the original complaint, one singular issue and that was geographic market. But I thought in that first dismissal, the district court also rejected the state statutory claims. It did. I'm sorry. It rejected the state statutory claim. Well, based on the pleadings, it didn't say we pleaded enough. It didn't have enough information, but it did accept the tortious interference with business claim. It did say we had sufficiently plead the tortious interference to go forward. And that's, that really is kind of the trick box in this case is because, so we do the original complaint, we get the singular issue on dismissal, that's the geographic market and it did address some of the state law claims. But then the state, the federal court, the district court moves forward with the case. It set a rule 16 conference. We have the rule 16 conference. It sets a case management conference, a case management order. We start to engage in discovery and it's at that point, then we also, because we had deadlines under the case management order, we then filed our motion to amend. And so we filed, we filed the motion to amend, but the district court assumed jurisdiction and moved forward with diversity jurisdiction. It had never been an issue until the second order in this case. But it could come up at any time. And I mean, I guess we'll ask council opposite this, but if there's no dispute, there's no dispute. I mean, that means the district court would have erred to the extent that it declined to exercise jurisdiction on the state claims, irrespective of what happens to the federal antitrust claims. Yes. Yeah. I agree with that. And I think the statute you may have been looking for is, I think, or I think what the remedy would have been here if there was a, somewhat of a claim or a concern or an issue with the diversity jurisdiction is under 28 U.S.C. 1653 in the Penrod case. And that is the procedure is to remand the case back to the district court, or for you, the proper procedure is to, if there's a question, which I don't think there is, to remand it to back to the district court to fully determine the residency. In the Penrod drilling case, this court held that 28 U.S.C. 1653 is to be construed very liberally. And so if there is a question, you know, then we go there. But I don't know that there's a question when the defendants have admitted in their briefing that there is diversity jurisdiction. And when you look at the Harvey case, the Harvey case said, you know, it lays out the test for how to determine jurisdiction. Under Harvey, the citizenship of an LLC is determined by the citizenship of its members. And in Harvey, you had a Louisiana plaintiff, you had a Texas defendant, and then defendant Graywolf was both a Texas and Nevada resident. And so the Harvey court held under that scenario, there was complete diversity and diversity jurisdiction. JUSTICE KENNEDY Mr. McKinnon, I would suggest you get to the other issues of the case. I know you're responding to Judge Wilson's question. But I think you've answered it and can address issues about the product market and whatever else you want to deal with. MR. MCKINNON Yeah. I'd like to talk about the Twombly standard, Your Honor. And that is, the issue before this Court is Twombly. An antitrust case do not necessitate a higher in this case, CVS and Caremark. Dismissals prior to giving us an opportunity to conduct discovery should be granted very sparingly. Even when the allegations contained in the complaint remain sparse, after prompting by the District Court, an antitrust case should not be dismissed at an early stage. And that's the Gulf Coast, that's the holding of this Court in the Gulf Coast. JUSTICE LEBEN When I read the complaint, it really did look like you've extensively said you were wronged when the application was rejected on the disclosure theory. And in part, you say, we know we were wrong because we were accepted by what, eight other? MR. MCKINNON Other PBMs, right. JUSTICE LEBEN Okay. But so how does that then morph into a complaint that's alleging anti-competitive impact across the state of Mississippi if you're already in eight other PBMs independent of the Caremark PBM? MR. MCKINNON It is. We said the state, we also did focus on Green and Stone Counties. And the issue is, that is where we do primarily most of our businesses in Green and Stone Counties. And if we have, you know, we serve nursing homes. JUSTICE LEBEN Let's start first at the revised allegation that it's the whole state of Mississippi. People don't like to go across state lines to get their prescription drugs. How could that possibly be consistent with the statement in the complaint that you're in eight others? MR. MCKINNON But we're not in this one. I know it. But so for the folks that are in this PBM, we don't get the benefit of their business, and they're not going to buy. JUSTICE LEBEN But that's all saying you're harmed. And I understand you're not getting reimbursed. But I don't understand how the consumers in Mississippi, you've shown antitrust injury to them. Maybe what would help rather than explaining it is tell me the paragraph in the complaint that alleges how consumers and other pharmacies are harmed. Where in the complaint? MR. MCKINNON I don't know that I specifically say that. JUSTICE LEBEN That's a big problem, isn't it? MR. MCKINNON And I think it is a big problem, except under the Gulf Coast case, things can be inferred. I mean, if you remember the history of the Gulf Coast case, the district court dismissed them several times, and they could just never seem to get their complaint right. And this court held, well, when you look at everything, when you look at the total, then we can infer some antitrust issues. There, the issue was interstate commerce, and the defendants claimed it wasn't pled, but the Gulf Coast court, this court said, we need to look at the complaint as a whole. JUSTICE LEBEN I guess I'm difficulty, where do I, how do I even infer any price impact on consumers? I read the complaint, and I see big impact on you. That's, but, but if you're asking us to infer the antitrust injury, again, sort of, I don't even quite understand what the logic is as to anti-competitive impact across the state, if one particular pharmacy was said, you know, your dad, you know, he's a fraudster, so you can't participate in our process. MR. MCKINNON The, the, I guess my answer to that, and I guess my answer to that is, is that was part of the 16 to 48 percent. We didn't complete a, we didn't plead a completed monopoly. We, we pled the monopoly power, and so when you look in the markets of, of, of Green and Stone County, because of their conduct with the PBM and what they were doing, they, they were, they were rocketing up the, the scale as well. JUSTICE LEBEN They have, as you pled, and I'm sympathetic to your argument, at the 12B6 stage, 47 percent sounds like could be, but, but, but I still don't see the tie that that connects to how they're allegedly maltreating this particular pharmacy because of a father. MR. MCKINNON Well, because we did plead, also, that it, it affects the, what consumers pay for the, for the price, for the products that they're receiving, and that, that it impacts their, that is pled in the complaint. JUSTICE LEBEN In your pharmacy? MR. MCKINNON Well, it would be in our pharmacy and other pharmacies, because, you know, if, if you're starting to capture all the market, you can control what you're charging. JUSTICE LEBEN You haven't said that other pharmacies have been kept out of the PBM. MR. MCKINNON I did not say that, no. JUSTICE LEBEN So, the 46 percent, is that a nationwide figure, a statewide figure, a Stone and Green County figure? MR. MCKINNON That was a Stone and Green County, well, I checked that, I believe that was a statewide figure that I had gotten. JUSTICE LEBEN All right, so, if RX Solutions is in eight other PBMs, or PDNs, how much of the market share do those eight PDNs cover? Is it 54 percent? MR. MCKINNON I don't know, I don't know that. I was looking at, what I was trying to do with that is show by, through their conduct, what they had done was just aggressively start to capture the market. They went from a market share of like 16 percent, have this PBM, and now they're up to 48 percent, and, you know, I was hoping that discovery through discovery, we would learn that it's continuing. JUSTICE LEBEN So, it's arbitrary treatment that doesn't have a business basis, so it must be anti-competitive? MR. MCKINNON Yes. JUSTICE LEBEN Okay. Is that inferred, or is that alleged? MR. MCKINNON I think it's inferred. I think it's inferred in the complaint when you look at all of the facts taken together. JUSTICE LEBEN So, the membership in the eight PDNs brings up maybe another issue. You've got to show a geographic market, but also the product market. So, if RX Solutions is in these other, I don't know how many PDNs there are, maybe there's dozens and dozens, maybe there's ten, but if you're a member of eight, then how is the relevant product market? I think you allege that it's the pharmaceutical or prescription medication market. Is there, are there allegations in the complaint about the impact on the pharmaceutical or prescription drug market, and does the pharmacy's membership in these other PDNs ameliorate that? You see what I'm saying? MR. MCKINNON Yeah, I do, and perhaps my complaint was pled a little poorly. The geographic market was pled as Green County, Stone County, and the State of Mississippi. We were focusing on Green County and Stone County, because that is the nursing homes that RX Solutions serves, is in those two counties primarily, and I threw in the State of Mississippi because I didn't want to be precluded from doing discovery on the State of Mississippi, you know, saying I think that this may be beyond that, and so State of Mississippi could be thrown in there so that I could do discovery on that and not be precluded by just limited to Stone and Green Counties, but so I really was focusing on, and the complaint really is about Stone County and Green County. MR. MCKINNON But product market, I mean, you've still got to show, do you not, or allege that you've been squeezed out of competition in the product market, or there's been a reduction in competition in the product market, but the fact that RX Solutions is in APDN seems to go against that, doesn't it? MR. MCKINNON A little bit, except when you look on the opposite side of it, and they're starting to capture 48% plus more of the market, and as I've alleged, because of that, they're controlling pricing, and the pricing is not to the benefit of the consumers. That is their conduct, and that is what is happening to the consumers. MR. MCKINNON Fifty percent is your sort of magic number for an actual monopolization claim, correct? MR. MCKINNON For a completed monopoly. MR. MCKINNON Are you proceeding under completed or attempted? MR. MCKINNON I was using that figure as monopoly power. It's showing that they do have the monopoly power because this is what's happening. MR. MCKINNON Completed monopoly. MR. MCKINNON They don't have a completed yet, because I assume when we go through discovery, it'll certainly be more than that, but I wanted to use, you go from 16 to 48%, it shows that you are monopolizing a market and controlling that market, and that day is not done yet. MR. MCKINNON If we determine . . . I'm sorry, one final question. I'm not forecasting anything, but if we determine that there's jurisdiction, diversity jurisdiction, irrespective of what happens to the federal claims, do we decide those now? Do we weigh on the district court's dismissal, or do we just vacate and send it back? MR. MCKINNON What would I want you to do, or what do I think you should do? I think, I guess . . . MR. MCKINNON What do you think we should do? MR. MCKINNON What I think you should do is weigh on those now. It either is a complaint, a First Amendment complaint that meets the Twombly-Gulf Coast standard, or it is a First Amendment complaint for the antitrust claims that doesn't meet it. I would suggest when read as a total, it in fact does meet it. I see my time is up, unless you have any more questions. I will hear from you again. MR. HORVATH Good morning, Your Honors, and may it please the Court, Seth Horvath for the Appalese Caremark and CVS Pharmacy, Inc. We're asking the Court to affirm the district court's dismissal in its entirety. At its core, Your Honors, this is a case where the plaintiff was denied an application to participate in Caremark's pharmacy networks, and then it filed . . . MR. MCKINNON Is there diversity jurisdiction? I'm interrupting you because that's the primary issue. I want to know what your position is on whether the Court had diversity jurisdiction. MR. HORVATH Sure, Your Honor. We do believe there's diversity jurisdiction here. The thing that we took issue with was plaintiff's contention that the district court didn't have any basis for rejecting diversity jurisdiction just based on how it was pleaded. The complaint didn't . . . MR. MCKINNON You conceded it in answering the first complaint. You just didn't concede it in the second complaint. MR. HORVATH Correct. In our jurisdictional statement before the Court, we conceded it again. MR. MCKINNON We can travel under your evidentiary admission regardless of the force of the first complaint or your first answer. MR. HORVATH We are conceding it, even though it becomes an evidentiary admission as opposed to a judicial admission. We believe that there is subject matter jurisdiction over the state law claims. Where we, I think, part ways with counsel is what this Court should do with the state law claims now that we're here. Those claims were fully briefed before the district court. Both sides had a chance to win. The district court opted not to reach those claims when it determined that it didn't have diversity jurisdiction. We think there's a sufficient record for the Court to proceed to the resolution of those claims. We've tried to locate a couple cases to provide the Court with guidance based on its own precedent and having done a similar thing before. There's the Rojas case that we cite in our brief, and there's also the Hossain case. Those were both instances where there was a 12B6 situation. A dismissal order was entered by a district court, and then on appeal, this Court adjudicated the propriety of the dismissal on alternative grounds that weren't reached by the district court. So we believe here, given that the full case is up on appeal, the Court can, in fact, affirm the district court's judgment. That is to say, affirm the dismissal of the state law claims on alternative grounds, and those alternative grounds are the fact that the state law claims fail as a matter of law for the reasons stated in our briefing. And I think that sort of gets me back to where I started, Your Honor. This lawsuit ended up being a situation where voluminous claims were pleaded against Caremark based on a network denial. The network denial mushroomed into two federal antitrust claims and three claims alleging violations of various state statutes and state common law. So the plaintiff chose to plead this case in a very complicated manner, and when the plaintiff chose to do that, the plaintiff undertook a burden under Twombly. Twombly says very clearly, it's very well established, that the complaint has to state factual allegations that rise above the speculative level. And the reason Twombly is particularly informative here is we're dealing with an antitrust case. Twombly was an antitrust case, and Twombly had some very pointed words regarding discovery in an antitrust case. It said, in an antitrust situation, a district court must retain power to insist upon some specificity in before allowing expensive discovery to proceed. And that's where we find ourselves in this case. The plaintiff was given two opportunities by the district court to allege antitrust claims and state law claims. The district court entered two very detailed orders explaining why the plaintiff didn't meet its chosen burden to proceed with those antitrust claims and those state law claims. And there are actually three separate grounds for affirming the dismissal of the Section 1 claim. There are three separate grounds for affirming the dismissal of the Section 2 claim. And there are independent grounds for affirming the dismissal of the state law claims based on their legal insufficiency. Judge Ozerden, and I think your primary argument is just Twombly deficiency as to Sherman Act generally, whether it's geographic market or anti-competitive injury. Once you get into the weeds, I do have some difficulties. I'm not saying that I would get into the weeds, but I'll tell you the two in case you have time to touch on them. The Section 1 difficulty is, am I right that he applied hood, which is strong law, Judge Garwood, but post-American needle, you could still have a corporate cartel. And so if I'm not mistaken, Judge Ozerden takes judicial notice that Karamark and CVS are both sibling subsidiaries. That's one concern that I don't, I don't see that sufficiently in the, in the complaint, the concession that they are so tightly together as distinct from operating independently and therefore possibly collusively. And the second concern I have jumping to Section 2 is Dome Stadium, 40, what is it? 46%. That's a lot higher than I see other circuits affirming dismissals. And I, I'd like to address both those concerns. I'll focus first on that Section 1 issue. The hood case that your honor mentioned comes up in the context of, of addressing what happens when there is alleged collusion between corporate subsidiaries with a common parent. And hood rejected as a matter of law, the sufficiency of a conspiracy claim under Section 1 under those facts. Those are the facts that we have here. We have a parent corporation, CVS Health Corporation, and we have two subsidiaries of CVS Health Corporation, Karamark LLC and Karamark Pharmacy Inc. One is a PBM, one is a retail pharmacy company where your honor, I think is, is wholly owned. Correct. The, the, the Karamark Pharmacy Inc. is directly owned as a corporate subsidiary. And then CVS Health Corporation is the owner of the member in the LLC for Karamark LLC. So it fits within the hood framework. And I think your honor's question is about where does American Needle take hood? American Needle was decided after hood. It was a 2010 U.S. Supreme Court decision. And the plaintiff is relying very heavily on American Needle to support this notion that it's sufficiently alleged the joining of two independent centers of decision making to use the burden would be on them to allege that they're independent and colluding as distinct from common purpose. Is that right? That is correct, your honor. It's their burden to haven't carried that burden. And more importantly, American Needle doesn't support a fundamental reworking of all that prior precedent, including hood. American Needle was a very specific case. It involved 24 separate NFL teams. I don't want to dominate. So the second dome stadium, would you agree it would be pretty assertive for us to say at the 12B6 stage, are you still pressing that? And do you have any other circuit that's affirmed a dismissal when that's the allegation? The reason that we're still arguing that dome stadium is pertinent here and that the 46% market share alleged in the complaint is insufficient is there has to be some standard. And there's been a general consensus in the case law that if it drops below the 50% threshold, that's problematic for purposes of pleading a section two claim. The plaintiff had a couple chances to plead. Not only could it not plead. Circuit though, when you say at the pleading stage, I thought the courts that are affirming dismissal, it's down in the single digits. Your Honor, there are some cases that we cite in our brief where the courts focus on lower digit numbers. And I'm hesitant to say there's a categorical rule in the courts about when that threshold is met and when it isn't. But the other problem with this allegation of 46%, there's no context to the allegation. There's a loan market share allegation of 46%. It's based on the plaintiff's belief. It's not clear whether that allegation refers to overall revenue for prescriptions versus the volume of the drugs that are being dispensed. It's just a loan freestanding allegation that the plaintiff has asserted without any further factual context or support. And so, because dome stadium was so explicit and because there is case law from other jurisdictions that talk about the necessity of meeting a threshold, we do think it's something the district court properly focused on. With respect to both of those Section 1 and Section 2 claims, I want to remind the court as well that there were multiple grounds on which the district court relied to dismiss the Section 1 claim and the Section 2 claim. So, I've spoken already at some length about the district court's reliance on the corporate affiliation between Caremark and CVS Pharmacy and the effect that that affiliation had on the analysis. But we have to remember, too, the district court's analysis of product market and geographic market. And Judge Wilson had asked some questions to counsel about the sufficiency of the allegations regarding the product market. And that's a key point that the district court focused on because the allegations of product market were focused on prescription medications. And a market definition under all the antitrust case law has to include interchangeable products. It has to account for that. And that's because if you narrowly define a market to exclude interchangeable products, you're distorting the market. And I think the classic example, Your Honors, is you wouldn't define a product market as being a product market for Coca-Cola because that doesn't take into account Pepsi-Cola, which is a substitute for Coca-Cola. The demand for . . . And also, Judge Ogden's concern specifically was, didn't consider over-the-counter medications. I don't think that's like Coke and Pepsi. It does seem to me that prescription jugs are a pretty finite, definable market. And Tylenol doesn't substitute for prescription medicine and shouldn't be used at all, of course. In today's world, Your Honor, that's an astute observation. There is the necessity of at least addressing the effect that over-the-counter medications would have on the product market definition because there are some over-the-counter products that could theoretically substitute for prescription medications. The market was defined so broadly to encompass prescription medications. There are certainly examples within that market that don't need to be prescription, that could be over-the-counter. And so the District Court judge focused on that aspect of the analysis and the plaintiff's failure to articulate how, if at all, over-the-counter medications were incorporated into the plaintiff's market definition. Is that 12b-6 stuff or is that for later? Your Honor, I think that it is 12b-6. And the reason I say that is this Court's decision in the Apani case. Apani's been precedent in this circuit since 2002. Apani says very clearly that where a plaintiff alleges a proposed market that doesn't include substitutes, and that's what we're focused on here, the substitution of over-the-counter for prescription. When the plaintiff doesn't include substitutes, the market is, and I'm quoting it here, legally insufficient and a motion to dismiss may be granted. So there's been long-standing recognition in this circuit that substitutes have to be considered in the analysis of the allegations of the product market. But what could the complaint have said that would have satisfied that? Obviously, whether those labels have to be used, I would think not. There needs to be some assertions that perhaps cover it. Would it have been sufficient for the complaint to say that the market we are defining, by and large, there are not substitutes outside of prescription medicine? And just in some general way say, I'm not going to go through the drill of identifying all the other things on the shelves in a drugstore? I suspect, Your Honor, that perhaps the reason the complaint didn't define the market in that fashion is the plaintiff could not have credibly alleged that there are no over-the-counter substitutes for prescription medication. So the decision was made to define the market in that way without any consideration Limited substitutes for some prescription medicine, I would think. For some prescription medicines, there are no substitutes. For others, there would be. So did it need to say that and then define how that affected the market? I do believe, Your Honor, there needed to be some acknowledgment in the complaint of the effect of substitutes on the market definition. And I say that based on Apani and also based on the New Orleans Association of Cemetery Tours case. That was another case where the court was particular in saying that there has to be allegations that account for substitutions in the complaint. If there's not, the complaint can be dismissed. The factual scenario in that case was a bit different from what we have here, but I do think the example is instructive. There were a couple different substitution issues in that New Orleans Association of Cemetery Tour Guides case. There were historical site tours that were a substitute for cemetery tours. The court acknowledged that at the pleading stage. And the complaint in that case didn't explain or attempt to address the nature of the relationship between those substitutes. Then there was another substitution relationship in that case the court focused on with respect to particular cemeteries and tours of those two particular cemeteries being a substitute for broader cemetery tours. So to answer Your Honor's question more directly, there's case law in this circuit that suggests there has to be some attempt in the complaint to deal with substitution issues because they're so material to the market definition. And the second point on the Section 1 claim is of course, Your Honors, that there was a deficiency in the geographic market that was alleged. And the district court judge also focused on that deficiency. And the reason for the district court's concern with the lack of specificity in the allegations of the geographic market was twofold. There was a concern with defining the entire state as the market for prescription drugs. And there was also a concern with defining solely two counties as the relevant market. And the statewide definition has been called into question in other district court cases. We cited two of those in our briefs. There's the OGD equipment case. There's the physician specialty case. The two county definition, as the district court concluded, is just simply too narrow. The complaint doesn't explain why the geographic market should be limited to those two counties. It doesn't explain why Harrison County, which is where the plaintiff does business, or other neighboring counties should be excluded from that market. And I think that in this case it's become clear that the two counties named in the complaint are not the only counties in which the opposing counsel talked about serving nursing homes. But other counties are involved as well. I think, Your Honor, there was no attempt made in the complaint to explain why the definition is only circumscribed to those two other counties when there are other adjacent counties that perhaps are relevant to a market definition. And so we in the district court are left to question whether there's sufficient factual specificity under Twombly to proceed with this section one claim. I want to turn with my brief remaining time to other issues with the section two claim, Your Honors. I spoke initially in response to the questions from Judge Higginson about the domed stadium case. And the domed stadium case falls under the rubric of determining whether the complaint sufficiently alleges monopoly power or a threat of obtaining monopoly power. There were also two other grounds that were briefed before the district court illustrating why the section two claim wasn't sufficiently pleaded. And those have to do with the lack of anti-competitive conduct and the lack of anti-competitive injury. And I want to take the injury allegations or the absence of the injury allegations first. The plaintiff didn't plausibly allege an anti-competitive injury under section two. And it's important to remember that under section two, the reason a plaintiff has to allege anti-competitive conduct and injury and not just monopoly power is the mere possession of monopoly power isn't unlawful under section two of the Sherman Act. That comes straight from the U.S. Supreme Court's decision in Trinco. And here with respect to anti-competitive injury, exclusion from care marks networks alone doesn't rise to the level of anti-competitive injury. And the principle that underlies that is that antitrust laws are there to protect competition. They're not there to protect particular competitors. And the plaintiff hasn't alleged that there's been a rise in drug prices over a competitive level. The plaintiff hasn't alleged a decrease in drug supply. The plaintiff hasn't alleged a decrease in the quality of pharmacy services. And I think this gets back, Your Honors, to the fact that this lawsuit originated from a lone denial of a single network application. And the plaintiff tried to broaden that denial of the application into a broad-based series of claims for antitrust violations and violations of unfair competition laws. So the allegations just don't articulate why there's an injury that rises to the level of an antitrust violation. In the health insurance context in general, it's not an antitrust violation to exclude a provider from a network. There's cases in our briefing, the Bristow case, the Primate case, and the Domell case, that illustrate that point. And we'd submit that those cases are persuasive here. And doubling back to the anti-competitive conduct, I'll try to wrap this up, Your Honors, with my remaining time. The general principle in antitrust law from Trinco is that a party has discretion to refuse to deal with others. It's just embedded in the law. There is a limited exception if the party terminates a long-term, profitable relationship that it's engaged in, and it does that in a way that harms competition. So that's the framework for alleging anti-competitive conduct under Trinco. And in this case, the amended complaint doesn't allege that there was a long-term, profitable relationship between Caremark and the plaintiff. It doesn't allege that the defendants suffered harm. That is to say that Caremark and CVS suffered harm after Caremark refused to contract with the plaintiff. It doesn't put the conducted issue within the Trinco exception. And for that reason, it can't state a Section 2 claim. Your Honors, I see I'm almost out of time. And I would just ask that for the reasons discussed here today and the reasons in our brief, the Court affirm the District Court's dismissal order in its entirety. And subject to any further questions, I will conclude my remarks with that. Thank you, Counsel. Thank you, Honors. All right. Let me begin, because sometimes I think I'm clear and I'm not. Judge Wilson, to your question about what you should do if you find there's jurisdiction, how you should resolve the claims, I was addressing my response to the antitrust claims. As to the state law claims, I think those need to be, because they were never decided by the District Court. So I think that would need to go back to the District Court to decide those state law claims. The case is cited by Mr. Horvath in his brief about the procedures on that issue. They deal with, if the record shows enough evidence, then you can address issues that haven't been decided by the District Court. And here, we don't have that. The record is not complete enough. But in fact, the record's in our favor, because originally, Judge Oserden ruled in his first ruling that we stated a tortious interference claim against Karmark, and they have moved to dismiss the tortious interference claim against Karmark again and against CVS. And we've used the same language that Judge Oserden held was sufficient against Karmark for CVS. So the record is clear, based on the prior ruling of Judge Oserden, that we have, in fact, stated a tortious claim. And so I would suggest that the issue for you to decide would be, have we satisfied the pleading standard under Twombly for the antitrust case? That's what I was trying to say. I don't know that I did a good enough job. The issue is at least briefed here, is it not? Opposing counsel does have a section at the end of his brief dealing with the state law claims on the merits, even if, regardless of the jurisdiction. I haven't looked back at it, but I do see in your table of contents you're addressing that, too. Haven't both sides addressed the merits? Maybe not sufficiently, maybe we would agree. But haven't both sides addressed the merits of the state law claims here? No. Not as under the First Amendment complaint, we didn't. We addressed the merits under the tortious interference claim against Caremark in the first complaint, which Judge Oserden sustained, you know, he held that was a viable claim as far as CVS, and the other claims that we amended based on his comments about dismissing them, they've not been addressed now. I don't think the record is such that this Court should address it. That would be something I think the district court should address. We'll take a look at that, and you can get back to your argument. The Twombly standard, let me say this about the Twombly standard, and this is Gulf Coast Hotel case quoted Twombly when it said, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely. And I would suggest that the argument really is, our recovery is remote and unlikely, but under Twombly and under Gulf Coast, that's sufficient. We have pled, here's some of the allegations that we pled in the complaint. We pled that on paragraph 25 of our first amended complaint that CVS's retail pharmacies operate in a geographic market, the same geographic market, in the same geographic market operated by DRX Solutions. Defendants conspired and colluded to use the PBM to improperly control and manipulate the cost of prescription medications and engage in prohibited conduct. We allege in paragraph 27 that their conduct, our practices are unfair to consumers. We allege in paragraph 28 that their improper monopolization of the prescription medications in these geographic markets leaves consumers with little or no choice of selecting alternatives for the purchase of prescription medications because they've improperly controlled the market there. We allege in paragraph 29 they've improperly conspired and colluded to create an improper monopoly on prescription medications and we've alleged that it impacts driving folks like RX Solutions, the small mom and pop shop pharmacies, their conduct impacts that and drives them out of business. We've alleged that it does, in fact, impact the consumers and what they pay and they're going to pay higher prices for it because there is a lack of competition. There are no more mom and pop shops like RX Solutions in the area to provide those services. So and, I mean, basically that's it, Your Honors. If you have any questions, I'd be happy to address them, but I think we've met the Twombly burden. All right, Mr. McKinnon, thank you, both of you. You have brought up the rear, but you have done a good job.